Filed 3/30/21  P. v. Harrison CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>VEELEWERANCE HARRISON,<br><br>        Defendant and Appellant. | A156388<br><br><br>(Alameda County<br>Super. Ct. No. 178421) |

This is an appeal from judgment after a jury convicted defendant Veelewerance Harrison of voluntary manslaughter with personal use of a firearm.  Defendant challenges the judgment on grounds of instructional error, prosecutorial misconduct, ineffective assistance of counsel, erroneous exclusion of evidence, and cumulative error.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 8, 2016, an information was filed charging defendant with first degree murder of Juan Hernandez with an enhancement for personal use of a firearm causing great bodily injury and death.

Trial began on August 29, 2018.  Evidence revealed that defendant fatally shot Hernandez multiple times outside the residence of 7533 Arthur Street (7533 Arthur) just after midnight on November 16, 2015.  An autopsy revealed Hernandez died from seven bullet wounds from bullets that entered his head, neck, leg, torso, and buttocks.  Police later recovered eight

1

.45-caliber cartridge casings near Hernandez's body, as well as a single .380-caliber casing found "more in the street . . . ." No firearm was found at the scene. A police search of 7533 Arthur uncovered marijuana growing in three rooms, an assault rifle and two shotguns.

Three eyewitnesses testified for the prosecution: M.M., C.B. and K.C., all of whom were neighbors of defendant, who lived at 7538 Arthur Street (7538 Arthur). M.M. lived next door to 7533 Arthur and was awakened in the early morning by two or three loud pops, followed a few minutes later by two or three more pops. From her front window, M.M. saw three people leave 7533 Arthur and run down the street. She then saw defendant across the street on his porch, pointing a gun at the people running away.

Three of M.M.'s four home security cameras captured Arthur Street in front of her house, where the shooting occurred. Soon afterward, the police accessed her home computer to watch the four videos. The police made a copy of the video from just one of the cameras directed toward Arthur Street.

At some point, M.M.'s system recorded over the video footage from the night of the shooting. M.M., who watched the four videos the evening after the shooting, testified as to what she saw.[1] Among other things, M.M. saw defendant exit a car and carry what appeared to be grocery bags into his house. As the car pulled away, someone came out of the house at 7533 Arthur and walked into the street. M.M. did not see this person fire a gun; however, based on her memory of hearing loud pops, she surmised that he shot at the car as it pulled away. At this point, defendant exited his house, still holding bags, and then reentered. He exited again a few minutes later

---

[1] The evening after the shooting, M.M.'s neighbor told her that defendant had been to her house, looking for her. M.M. checked her video to confirm that defendant had been to her house, after which she decided to watch all the videos from the previous evening.

and walked across the street, "and then that's what took place." She saw muzzle flashes. Afterward, defendant walked back across the street to his house. As three people exited 7533 Arthur and ran down the street, defendant stood on his porch, pointing his gun at them.

C.B. was sleeping in his living room when a loud pop woke him up. Minutes later, C.B. heard arguing and looked outside to see defendant and another man arguing in front of the house next door. Both men were loud and seemed agitated. As C.B. watched from his window, defendant pulled a gun from his jacket and shot the other man. C.B. did not see the other man do anything to indicate he had reached for a gun; however, he could not see the man's hands.

K.C. also heard arguing outside, followed by a minute or two of silence then gunshots. About 30 seconds later, K.C. looked outside and saw defendant standing outside his front door across the street, holding a gun. She also saw several men running down the street.

A portion of the video footage copied by the police was played for the jury. According to counsels' descriptions,[2] the footage reflected that, at the 11:25 minute mark on the video, defendant briefly appeared, holding bags, before walking out of view. At the 12:23 minute mark, a car drove into view and waited about a minute. Around the 13:42 minute mark, the car drove away and a man wearing a baseball hat (Hernandez) left the house at 7533 Arthur, walked into the street, and appeared to "pull[] up something on his left-hand side . . . ." At the 14:40 minute mark, defendant went outside,

---

[2] Both counsel played segments of this video footage for the jury during opening statements, defense counsel beginning at the 5 minutes 14 seconds mark of the video and the prosecutor beginning at the 14 minutes 40 seconds mark. This timing does not correspond to the time of day the video was captured.

crossed the street, and stood behind a pickup truck. Hernandez came out of 7533 Arthur shortly afterward and stood near the same truck. They appeared to converse for about a minute. Although defendant was partially obscured by the truck, Hernandez was "aggressively" gesticulating, moving his hands in defendant's direction, as they talked. Suddenly, muzzle flashes appeared and Hernandez fell to the ground. Defendant then walked across the street, out of view. Minutes later, at the 18:39 minute mark, people ran out of 7533 Arthur, past Hernandez, and down the street. The parties disputed whether one of these people bent over Hernandez before running away.

Defendant testified in his own defense. A postal service supervisor for many years, defendant had lived with his disabled brother at 7538 Arthur for over 16 years. On the night in question, defendant's girlfriend, E.C., arrived at his house between 11 p.m. and midnight with her two young children asleep in the backseat. Defendant, awakened when E.C. honked her horn, arose, retrieved some bags of items he had purchased for her, and walked outside. E.C., however, had already left, which puzzled defendant. A short time later, E.C. returned and honked again, so defendant gathered the bags and went back outside. As he opened the passenger door to give her the bags, E.C. said, " 'Hurry up and get in the car. Somebody is out here with a gun.' " Not believing her, defendant said, " 'If there's anybody out here with a gun, please don't shoot. This is Vee. This is Money [his nickname] up out here. Don't shoot.' "

Defendant ran back inside and got his gun from under the bed. Walking back to the front door, he heard a gunshot. He put a magazine loaded with eight bullets in the gun and cocked it, chambering a round. A minute later, he walked outside and shouted in a voice loud enough for the

4

whole block to hear, " 'I know nobody just shot at my girl,' " and, " 'Who did this?' " Defendant then sat on the trunk of his car to wait for E.C. to return.

Eventually, Hernandez appeared and yelled, with a "hella tough" look and balled-up fists, " 'I shot.' " Defendant asked what happened, and Hernandez replied that he had shot at the car. Defendant stated, " 'What's wrong with you? That was my girlfriend. I know you've seen her car out there because [it] is always in front of my house.' " Hernandez said E.C. was "getting the block hot" and that he tried to hit her when he fired. Calmly, even sympathetically, Hernandez said, " 'Oh, man, if I was you, I'd shoot me too,' " to which defendant responded, " 'Nigga, what?' " Defendant turned away, and Hernandez said, aggressively with a raised voice, " 'Oh, so you got a gun.' " Defendant replied, " 'Whatever,' " and, " 'It's time to go.' " But Hernandez reached for his left side, and defendant, seeing a bulge under Hernandez's shirt, believed he was reaching for a gun. Afraid, defendant raised his gun and open fired. After being hit, Hernandez raised his left hand, and defendant, again believing he would be shot, fired and kept firing until the magazine emptied.[3] Defendant explained, "[I]t was either him or me, and I had to shoot him."

After the shooting, defendant went back to his house and saw three men running out of 7533 Arthur. One of them approached Hernandez's body, lifted his shirt, and grabbed what defendant believed, but did not actually see, was a gun. According to defendant, "I seen [*sic*] [that person] putting [the gun] in his waist when he got it off of [Hernandez]." Defendant pointed his gun at that person and said, " 'Please don't do nothing,' " and the men ran off.

---

[3] Defendant testified that he had no memory of Hernandez's falling to the ground and did not aim or shoot at him while he was on the ground.

Distraught, defendant changed clothes and ran 12 to 15 blocks to E.C.'s house. The next day, defendant admitted to his neighbor V.M. that he shot Hernandez. Yet, he did not tell the police because he had no money for a lawyer and worried about his disabled brother. Defendant discarded his gun three weeks later.

Not until several months later was defendant detained and interviewed by the police. Initially, defendant denied any knowledge of the shooting and claimed to have been at his girlfriend's house at the time. Defendant explained, "I didn't have everything I needed before I was going to turn myself in," such as money for a lawyer and a place for his brother to stay. Defendant eventually acknowledged that he shot Hernandez but did not tell the police that he saw a bulge near Hernandez's waist or a gun on Hernandez's person.

Finally, defendant's neighbor V.M. testified that he had known Hernandez for about two weeks, as Hernandez was staying at 7533 Arthur. On the night in question, V.M. visited 7533 Arthur and saw Hernandez smoke " '[q]uite a bit' " of methamphetamine, or crystal. Afterward, he also saw Hernandez remove a gun from the right side of his waistband and handle it with his right hand. Later, after V.M. returned to his house, he heard one shot followed by five to eight shots about five minutes later. He went outside, saw Hernandez's body on the ground, and called police. The next day, defendant tearfully told V.M. that he shot Hernandez, not because he wanted to but because he believed Hernandez was going to shoot him. Defendant told V.M. that it looked like Hernandez was going to take out a gun; defendant did not say that he saw Hernandez with a gun. Months later, after his own arrest on unrelated charges, V.M. reported defendant's confession to police.

6

On September 7, 2018, the jury found defendant not guilty of murder but guilty of voluntary manslaughter with personal use of a firearm. The trial court sentenced defendant to a 10-year prison term. Defendant timely appealed on January 25, 2019.

## DISCUSSION

Defendant raises the following issues on appeal: (1) the trial court's erroneous reading of CALCRIM Nos. 3471 and 3472 effectively precluded defendant from proving his primary defense of perfect self-defense; (2) the prosecutor engaged in extensive prejudicial misconduct;[4] (3) the court erred by instructing the jury under CALCRIM No. 361; (4) the court erroneously excluded key evidence relating to Hernandez's state of mind; (5) the court erred by refusing to instruct the jury not to draw an inference adverse to the defense based on the police's failure to recover evidence; and (6) the cumulative impact of these errors was prejudicial. We address each issue in turn.

## I.   *Instruction Under CALCRIM Nos. 3471 and 3472.*

The trial court gave both CALCRIM No. 3471 and CALCRIM No. 3472 over defense counsel's objections in relation to defendant's self-defense claim.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]" ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) While no particular jury instructions are required, the trial court also has a duty to ensure the instructions given "provide a complete and accurate statement of the law." (*People v. Ramirez* (2015) 233

---

[4] Alternatively, defendant argues his counsel rendered ineffective assistance by failing to preserve this issue for appeal.

Cal.App.4th 940, 949 (*Ramirez*); see *People v. Castillo* (1997) 16 Cal.4th 1009, 1115.)

On appeal, "[t]he independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citation] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration [citations]." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We consider the court's entire set of instructions rather than the challenged instruction in isolation, and we assume in doing so that "the jurors are capable of understanding and correlating all the instructions which are given to them." (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1294; see *People v. Castillo, supra*, 16 Cal.4th at p. 1116.)

A.    *Legal Framework: Self-defense.*

"For a killing to be perfect self-defense and exonerate the defendant completely as a justifiable homicide, 'the defendant must actually and reasonably believe in the need to defend.' [Citation.] However, '[i]f the belief subjectively exists but is objectively unreasonable, there is "imperfect self-defense," i.e., "the defendant is deemed to have acted without malice and cannot be convicted of murder," but can be convicted of manslaughter. [Citation.]' [Citation.] . . . '[A] defendant who, *with the intent to kill or with conscious disregard for life*, unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter.' [Citation.] 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime

8

greater than voluntary manslaughter.' [Citation.]" (*People v. Chavez* (2018) 22 Cal.App.5th 663, 689.)

Here, the trial court instructed the jury on the following self-defense-related instructions: CALCRIM No. 505 ("Justifiable Homicide: Self-Defense or Defense of Another"),[5] CALCRIM No. 571 ("Imperfect Self-Defense or

---

[5] CALCRIM No. 505 states in relevant part: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: [¶] 1. The defendant reasonably believed that he or [E.C.] was in imminent danger of being killed or suffering great bodily injury. [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger."

Imperfect Defense of Another"),[6] CALCRIM No. 3471 ("Mutual Combat or Initial Aggressor"),[7] and CALCRIM No. 3472 ("May Not Be Contrived").[8]

Defendant contends the giving of CALCRIM Nos. 3471 and 3472 was not supported by substantial evidence and opened the door to the prosecutor's oft-repeated, misleading argument that defendant provoked a quarrel and thereby forfeited his right to self-defense even though the victim responded to defendant's nondeadly provocation with deadly force. Defendant raises no complaint regarding CALCRIM Nos. 505 and 571. Defendant further contends the court erred in answering no to the jury's question, " 'Is there a definition of right of self-defense for [a] person who doesn't start the fight?' " We are not persuaded.

---

[6] CALCRIM No. 571: "Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force."

[7] CALCRIM No. 3471: "A person who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] AND [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"However, if defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicated [sic] the desire to stop to the opponent.

"A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim of self-defense arose."

[8] CALCRIM No. 3472: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

10

1.     CALCRIM No. 3472.

Defendant relies heavily on *Ramirez, supra*, 233 Cal.App.4th 940, to argue the trial court's giving of CALCRIM No. 3472 was prejudicial error. *Ramirez* held that CALCRIM No. 3472 misstated the law based on the facts before it because the instruction provided that a " 'person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force' " without making "allowance for [the defendant's] intent to use only nondeadly force and an adversary's sudden escalation to deadly violence." (*Ramirez*, at p. 945.) *Ramirez* acknowledged that "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances." (*Id.* at p. 947.)

*Ramirez, supra*, is distinguishable for several reasons. There, the two defendants (brothers, one of whom was armed) approached several rival gang members intending to start a fistfight. However, the confrontation quickly escalated to a gunfight, and the armed brother testified that he saw the victim, a rival gang member, walk toward the fist-fighting group and raise his hand while "holding an object that 'looked like a gun.' [The armed brother then] pulled his gun from his sweatshirt pocket and fatally shot [the victim]." (233 Cal.App.4th at pp. 944–945.)

Convicted of first degree murder, the *Ramirez* defendants argued the trial court's reading of CALCRIM No. 3472 precluded them from claiming *imperfect* self-defense despite evidence that the victim suddenly escalated a nondeadly confrontation with use of deadly force. (*Ramirez, supra*, 233 Cal.App.4th at pp. 943, 945.) The reviewing court agreed: "[T]he instructions and the prosecutor's argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense. The instructions and the prosecutor's

11

argument established as a matter of law that defendants were not entitled to imperfect self-defense if they contrived to use *any* force, even nondeadly force, but that was a question for the jury to decide on its own evaluation of the facts." (*Ramirez, supra*, at p. 953.)

In our case, unlike in *Ramirez*, defendant contends the CALCRIM No. 3472 instruction precluded him from claiming perfect self-defense, not imperfect self-defense. Further, while the *Ramirez* defendants approached their victims to instigate a mere fistfight, here, defendant instigated much more. Walking to the street with a cocked, loaded gun, defendant demanded, in a voice that could be heard by the entire block, to know who had shot at his girlfriend's car. When Hernandez appeared and admitted he had done so, defendant aggressively approached him with the loaded gun at his side and demanded to know, " 'What is wrong with you?' " At this point, the men, who both appeared agitated, argued loudly before defendant, fearing Hernandez would pull out a gun, shot at Hernandez eight times, emptying his magazine. These facts, significantly different from *Ramirez*, supported the giving of CALCRIM No. 3472.

*People v. Enraca* (2012) 53 Cal.4th 735 (*Enraca*) is instructive. There, one of the victims (also named Hernandez) slapped at the defendant's gun after the defendant pulled Hernandez's head back with gun in hand. At that point, the defendant shot Hernandez because he thought Hernandez was reaching for the other victim's (Gobert's) gun. After shooting Hernandez, the defendant shot Gobert because he believed Gobert was reaching for the same (nonexistent) gun as Hernandez. (53 Cal.4th at pp. 760, 762.) Under these

facts, the California Supreme Court upheld the giving of CALJIC No. 5.55[9] (which is substantially the same as CALCRIM No. 3472), reasoning that " ' "the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." [Citation.]' "[10] (*Enraca*, at p. 761.) Thus, the *Enraca* defendant could not claim perfect or imperfect self-defense because once he assaulted his victims with a gun, he created circumstances under which the victims were justified in meeting his deadly force with their own deadly force even if, when the defendant reacted by shooting and killing them, he believed one of the victims was about to shoot him. (*Enraca, supra*, at pp. 761–762.)

Defendant insists that, notwithstanding the fact that he was holding a loaded, ready-to-fire gun, he lawfully approached Hernandez and only shot

[9] CALJIC No. 5.55 provides: "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

[10] Defendant contends the California Supreme Court in *Enraca* did not address whether CALCRIM No. 3472 (or the substantially similar CALJIC No. 5.55) is a correct statement of law; rather, the *Enraca* court decided only that the evidence in that case supported the giving of the instruction. Not so. The court set forth the legal standard we just identified before holding, " 'As applied to this case, this means that if defendant had first assaulted [the victim], then unreasonably believed [the victim] was assaulting him, a claim of imperfect self-defense would be unavailable because a claim of perfect self-defense would have been unavailable had the belief been reasonable.' " (*Enraca, supra*, 53 Cal.4th at p. 761.) The court's statement of the law was necessary to this holding.

him after he appeared to reach for a gun.  We are not persuaded.  The jury was entitled to find on this record that defendant, like the *Enraca* defendant, " 'created circumstances under which his adversary's attack or pursuit is legally justified' " by (1) going into the street with a cocked and loaded gun and loudly demanding to know who shot at E.C. and (2) when Hernandez revealed himself, aggressively approaching him with this loaded gun in hand. (*Enraca, supra*, 53 Cal.4th at pp. 761–762; see *People v. Ross* (2007) 155 Cal.App.4th 1033, 1052 [evidence on appeal is viewed in a light most favorable to the judgment].)  The CALCRIM No. 3472 instruction was thus proper.

    2.    CALCRIM No. 3471.

Defendant does not quarrel with the legal correctness of CALCRIM No. 3471.  Instead, defendant contends the trial court prejudicially erred by giving this instruction because "there was no evidence of a fight at all, let alone a mutually agreed upon one.  Likewise, there was no evidence that [defendant] had started a fight or even engaged in any assault or criminal conduct prior to the shooting."  He further argues that delivery of CALCRIM No. 3471 enabled the prosecutor "to incorrectly argue" that he was not entitled to self-defense because he " 'create[d] the confrontation' and had been 'aggressive.' "

Again, the record, considered as a whole, defeats defendant's argument. Viewing the evidence in a light most favorable to the judgment, the jury could have reasonably found based on defendant's own testimony that he indeed started a fight.  As stated, he walked into the street with a ready-to-fire gun and loudly challenged whoever fired a gun at E.C.'s car to come out.  When Hernandez did so, defendant aggressively approached him, still holding the loaded firearm, and the men heatedly exchanged words.  It was during this

14

exchange that defendant claims Hernandez appeared to reach for a gun, which triggered defendant to fire and keep firing, even after Hernandez fell to the ground. No further evidence was required to support the giving of CALCRIM No. 3471. (See *People v. Marshall* (1997) 15 Cal.4th 1, 39–40 [trial court must give a requested instruction if it is supported by substantial evidence, meaning "evidence sufficient to deserve jury consideration"].)

Based on this evidence, we also reject defendant's claim that Hernandez first created the conflict by shooting at E.C.'s car. The jury could reasonably find that defendant—inside his house when Hernandez fired this shot—created the conflict with Hernandez by retrieving his gun, inserting the eight-bullet magazine and chambering a round, leaving his house after E.C. had already departed, and entering the street to demand that the shooter (Hernandez) reveal himself.

B.     *Trial Court's Responses to Jury Questions.*

Relatedly, defendant contends the trial court provided erroneous responses to two jury questions regarding the right of an initial aggressor to claim self-defense. Specifically, when the jury asked for "the definition of a 'fight' and when it starts," the court directed it to CALCRIM No. 3471. Then, when asked whether there was "a definition of right of self defense [*sic*] for person who doesn't start the fight," the court responded, "No."

Defendant faults the court for failing to respond "yes" and to direct the jury to CALCRIM No. 505, which described the circumstances in which a person *who did not start a fight* may resort to self-defense. According to defendant, the court's responses "clearly implied that the jury was required to evaluate [his] self-defense claim as if he had started a fight under CALCRIM No. 3471 . . . ." In support, defendant relies on *People v. Ross, supra,* 155 Cal.App.4th 1033.

15

As an initial matter, the trial court did in fact direct the jury to CALCRIM No. 505, when responding to a third juror question, which defendant disregards. Specifically, in connection with the above two questions, the jury asked, "If we think defendent [*sic*] meets first two criteria of Justifiable Homicide but not the third what is he guilty of[?]" The court responded, "See CALCRIM 505—all requirements must be meet [*sic*] under the instruction." We consider the court's instructions, including those set forth in response to jury questions, as a whole and not in piecemeal fashion, as defendant here does. (*People v. Castillo, supra*, 16 Cal.4th at p. 1116.)

Moreover, *People v. Ross, supra*, is inapposite. There, the reviewing court held that it was error for the trial court to instruct that a person charged with assault cannot successfully plead self-defense if he was engaged in " 'mutual combat' " with the victim, but to deny the jury's request for a legal definition of " 'mutual combat.' " (155 Cal.App.4th at p. 1036.) The reviewing court reasoned that "mutual combat" is a term of art that applies only to a violent confrontation that follows some sort of mutual consent or agreement to fight (of which there was no evidence). (*Ibid*.) Reversal was required because the trial court "gave an unwarranted and dangerously incomplete instruction on a *prosecution* theory in *rebuttal* of the defense," making it reasonably probable that absent the error the defendant would have received a more favorable result. (*Id*. at p. 1054.)

Here, unlike in *People v. Ross*, "fight" is not a legal term of art; it is a commonly used term with an ordinary meaning. The jury thus required no special instruction. As the California Supreme Court explains, while "[t]he court has a primary duty to help the jury understand the legal principles it is asked to apply," the court need not "always elaborate on the standard instructions. Where the original instructions are themselves full and

16

complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

Here, in addition to giving the jury CALCRIM Nos. 505, 3471 and 3472 relating to the circumstances under which an initial aggressor or mutual combatant may claim self-defense, the court instructed under CALCRIM No. 200 that, while some words have distinct legal meanings that are specifically defined in the instructions, "[w]ords . . . not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." We presume the jury followed this and other relevant instructions when evaluating defendant's self-defense claim. (*People v. Fuiava* (2012) 53 Cal.4th 622, 669.)

Thus, because the trial court fulfilled its duty to provide a full and complete set of instructions, there is no error or prejudice on this record. (See *People v. Beardslee, supra*, 53 Cal.3d at p. 97; *People v. Gonzales* (1990) 51 Cal.3d 1179, 1212–1213 [no error or prejudice where the trial court refused to provide additional instructions on malice and resolved the jury's questions by directing the jury to reread the malice and homicide instructions].)

C.    *No Prejudice.*

Even assuming for the sake of argument there was no basis on this record for giving CALCRIM No. 3471 or 3472, the jury was also instructed under CALCRIM No. 200, "Some of these instructions may not apply, depending on your findings about the facts of the case. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." It is therefore not reasonably probable the verdict would have been different had the court not given CALCRIM No. 3472 or 3471 because, absent a factual basis for these instructions, the jury simply would

17

have followed CALCRIM No. 200 and set them aside. (See *People v. Debose* (2014) 59 Cal.4th 177, 205–206 [where a jury is instructed on an inapplicable legal theory, the error is reviewed for prejudice under the " 'reasonable probability standard' " per *People v. Watson* (1956) 46 Cal.2d 818, 836].)

More importantly, the record in this case belies defendant's claim of prejudice. Notwithstanding the giving of CALCRIM Nos. 3471 and 3472 or the prosecutor's argument that these instructions entirely foreclose defendant's self-defense claim, the jury in fact accepted his claim. The jury convicted defendant of voluntary manslaughter, which required a finding that he had an honest but unreasonable belief in the need for self-defense—in other words, that he was entitled to claim imperfect self-defense. (See *People v. Randle* (2005) 35 Cal.4th 987, 995 [" 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter' "].) Imperfect self-defense was the only voluntary manslaughter theory presented to the jury.[11] Had the jury been misled by the CALCRIM self-defense instructions, the prosecutor's arguments based on them, or the court's response to the jury's questions in the manner defendant suggests, the jury would have found that he had no right to imperfect or perfect self-defense and would have convicted him of murder.[12] Again, under

---

[11] Defense counsel made a tactical choice to forgo reliance on heat of passion.

[12] The voluntary manslaughter verdict necessarily means the jury declined to apply CALCRIM No. 571, providing, "Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force."

*People v. Watson, supra*, 46 Cal.2d 818, there is no reasonable probability that the jurors would have reached a verdict more favorable to defendant but for the alleged errors. (See *People v. Ross, supra*, 155 Cal.App.4th at pp. 1054–1055.)

## II. *Instruction Under CALCRIM No. 361.*

Defendant contends the trial court prejudicially erred by giving the following CALCRIM No. 361 instruction to the jury: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

We review de novo the propriety of the trial court's instruction pursuant to CALCRIM No. 361, considering this instruction in the context of the entire jury charge. (*People v. Posey, supra*, 32 Cal.4th at p. 218; *People v. Fitzpatrick, supra*, 2 Cal.App.4th at p. 1294.)

Defendant relies on case law holding that "[CALCRIM No. 361] applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 117 (*Cortez*); accord, *People v. Saddler* (1979) 24 Cal.3d 671, 682–683 (*Saddler*).) Defendant denies that this standard is met here and faults the trial court for not making specific findings that he (1) was asked a question that called for an explanation or denial of incriminating evidence, (2) knew facts necessary to answer the question, and

19

(3) failed to deny or explain the incriminating evidence when answering the question, citing *Saddler, supra*, at pages 682–683.

As an initial matter, we disagree that, under *Saddler*, trial courts are required to make these specific findings on the record before giving CALCRIM No. 361. *Saddler* does not so hold; nor does a more recent California Supreme Court case that also considered the propriety of giving CACLRIM No. 361 (*Cortez, supra*, 63 Cal.4th at pp. 117–121). As such, we apply the general rule that in the absence of contrary evidence we presume the trial court was aware of and properly applied the law in deciding to give this instruction. (*People v. Woods* (1993) 12 Cal.App.4th 1139, 1152.)

Moreover, substantial evidence supported the trial court's giving of CALCRIM No. 361. The parties agreed at trial that in the video presented to the jury of defendant's encounter with Hernandez, Hernandez is seen motioning with his hands for roughly a minute before defendant shoots him. As defense counsel described it, Hernandez was "aggressively just sticulating [*sic*] towards [defendant] for approximately a minute." Defendant, in turn, agreed that the video showed Hernandez "talking with his hands the whole time" yet denied actually seeing Hernandez's hands moving during their conversation. Defendant then claimed that he shot Hernandez in fear for his life after Hernandez suddenly "reach[ed] up on his left side for his gun."

On this record, CALCRIM No. 361 was appropriate. Defendant claims not to have known that Hernandez's hands were moving, which, based on the video, was information he could reasonably be expected to know. (See *Cortez, supra*, 63 Cal.4th at p. 121 [where a defendant claims he or she "did not know" information that he or she " 'could reasonably be expected to know' " from the evidence, the instruction is appropriate].)

20

Defendant responds that even if his testimony conflicted with other evidence or could " 'be characterized as improbable, incredible, unbelievable, or bizarre,' " it was not the functional equivalent of no explanation. (See *Cortez, supra*, 63 Cal.4th at p. 117.) This argument misses the mark. Defendant testified that he shot Hernandez when Hernandez suddenly reached for a gun on his left side, out of fear for his life. Yet defendant does not explain why, if Hernandez's hands were visibly gesticulating for roughly a minute, he was surprised or frightened when Hernandez moved his hand toward his left side. Viewing the evidence in this light, the instruction was proper. (See *Cortez, supra*, 63 Cal.4th at p. 121.)

In any event, as explained *ante*, the trial court instructed the jury under CALCRIM No. 200, "Some of these instructions may not apply, depending on your findings about the facts of the case. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We presume the jury followed this instruction. (*People v. Fuiava, supra*, 53 Cal.4th at p. 669.) Thus, even assuming for the sake of argument that defendant is correct that CALCRIM No. 361 was not applicable here, the jury, following CALCRIM No. 200, would have disregarded it. Accordingly, there is no reasonable probability that, but for the giving of this instruction, defendant would have received a more favorable result. (See *Saddler, supra*, 24 Cal.3d at pp. 683–684; *People v. Covarrubias* (2016) 1 Cal.5th 838, 882–883.)

## III. *No Prosecutorial Misconduct or Prejudice.*

Defendant also seeks reversal on the ground that the prosecutor engaged in "extensive" prejudicial misconduct during closing and rebuttal arguments, by: (1) misstating the law and facts; (2) vouching for prosecutorial witness C.B.; (3) vouching for his own personal integrity and

21

expressing personal opinions; (4) denigrating defense counsel; and (5) appealing to "community values" and relying on irrelevant hypotheticals.[13]

A prosecutor engages in prosecutorial misconduct under state law if he or she uses deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).) When the alleged prosecutorial misconduct stems from the prosecutor's remarks or comments made before the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra*, 25 Cal.4th at p. 44.) If prosecutorial misconduct is found, the question becomes whether such misconduct was prejudicial, that is, whether it is reasonably probable a result more favorable to the defendant would have occurred if the prosecutor had refrained from the misconduct. (*People v. Haskett* (1982) 30 Cal.3d 841, 866.) If so, reversal is required. (*Ibid.*)

" 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1333.)

A. *Misstatements of Law.*

Defendant contends the prosecutor misstated the law when (1) arguing that he "illegally" brought his gun outside on the night of the homicide and (2) suggesting that the jury assume at the start of deliberations that his crime was second degree murder and then consider whether there were

---

[13] Defendant's motion for mistrial after the prosecutor's rebuttal argument, for prosecutorial misconduct, was denied.

factors in mitigation or aggravation that would lower his culpability to manslaughter or elevate it to first degree murder.[14]

As to the prosecutor's illegal gun statement, defense counsel immediately objected and, in response, the trial court admonished the jury that attorney "arguments are not evidence, and they're not the facts. You know what the law is. I've given it to you. You'll decide what this case is, all right?" The court later repeated this instruction before deliberations. Given both the curative and standard instructions, there was no reasonable likelihood that the jury construed or applied the complained-of statement in an objectionable fashion even if it could be deemed improper. (*Morales, supra*, 25 Cal.4th at p. 44.)

In challenging the prosecutor's suggestion that second degree murder should be the starting point for deliberations, defendant relies on *People v. Kurtzman* (1988) 46 Cal.3d 322, 335, 366, which held that "the trial court erred in instructing the jury not to 'deliberate on' or 'consider' voluntary manslaughter unless and until it had unanimously agreed on second degree murder." First, as the People note, "[n]othing in *Kurtzman* suggests that a prosecutor commits misconduct by recommending a jury start its deliberations in a murder case at second degree murder as a logical mode of analysis."

Also distinguishing *Kurtzman*, the jury here was instructed per CALCRIM No. 640 that it could "consider these different kinds of homicide in

---

[14] We reject defendant's argument that the court's purported error in giving CALCRIM Nos. 3471 and 3472 was exacerbated when the prosecutor argued that these instructions required the jury to reject all of his self-defense theories. As already explained, the court properly gave these instructions, and the prosecutor therefore appropriately relied upon them in argument. (See pp. 7–19, *ante*.)

whatever order you wish, but I can accept a verdict of guilty or not guilty of second degree murder only if all of you have found the defendant not guilty of first degree murder, and I can accept a verdict of guilty or not guilty of voluntary manslaughter only if all of you have found the defendant not guilty of both first and second degree murder." The trial court also gave the standard instructions that if an attorney's comments on the law conflict with the instructions, the jury must follow the instructions (CALCRIM No. 200); that defendant was entitled to a presumption of innocence (CALCRIM No. 220); and that unless the prosecutor proved beyond a reasonable doubt that the killing was not justified, the jury must find him innocent of murder and manslaughter (CALCRIM No. 505).

Given this full and accurate set of instructions, there is no reasonable likelihood that the jury misapplied the prosecutor's suggestion as to how to consider the different homicide theories. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 70 [reviewing court presumes that "the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade"].)

B. *Misstatements of Fact.*

Defendant next contends the prosecutor made the following misstatements of fact: (1) asking the jury, "[W]hy does [C.B.'s] mother say, you can't talk to anybody?"; (2) stating that defendant approached Hernandez "with a gun extended" and with his "finger on the trigger"; (3) suggesting that defendant yelled, "Come out here. I got something for you"; and (4) arguing that the police did not believe defendant during his interrogation. We find no prejudicial misconduct in these instances.

A prosecutor may make a " 'vigorous' presentation of facts favorable to his or her side" and has "wide latitude to draw inferences from the evidence

24

presented at trial," but may not mischaracterize the evidence or invite the jury to engage in speculation. (*People v. Hill* (1998) 17 Cal.4th 800, 823; *People v. Fuiava, supra*, 53 Cal.4th at pp. 728–729.)

First, when the prosecutor posed the question regarding why C.B.'s mother told him not to talk, defense counsel raised an objection which the trial court overruled. Notwithstanding the court's ruling, the prosecutor immediately clarified: "My point is, don't speculate as to that. Listen to [C.B.]. Oh, no, my mom wouldn't let me talk to anybody. And then, he tells you exactly what he saw, right?" After then describing some of C.B.'s testimony, the prosecutor emphasized, "[Defense counsel] had an opportunity to cross-examine and again, we ask jurors . . . to focus and see . . . what is actually being said and how it fits into the evidence." Thus, even assuming the prosecutor's initial question invited speculation, he cured any possible harm by clarifying to the jury it should not speculate.

Second, as to the prosecutor's references to defendant's approaching Hernandez with his gun extended and finger on the trigger, defense counsel forfeited his prosecutorial misconduct claim by not immediately raising an appropriate objection, which would have allowed the court to strike the references and provide a curative instruction. (*People v. Bradford, supra*, 15 Cal.4th at p. 1333.) In any event, considered in the context of his entire argument, we conclude the prosecutor's references to the position of defendant's gun was within the bounds of acceptable advocacy given the wide latitude prosecutors have when commenting on the evidence. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) As the California Supreme Court instructs: "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*Ibid*.)

Third, we likewise find no misconduct as to the prosecutor's statement that defendant yelled, "Come out here. I got something for you." Although defense counsel raised no objection to this statement, thereby forfeiting any complaint (*People v. Bradford, supra*, 15 Cal.4th at p. 1333), the prosecutor nonetheless clarified that when "I said the words or something to the effect, 'I have something for you.' I'm not trying to say he made that statement. I want to stick to the evidence. My position is that that's the mentality."

Fourth, we further conclude that the prosecutor's statement that the police did not believe defendant during his interrogation, considered in context, was within the permissible bounds of advocacy. Defendant flatly admitted that he lied to the police during the first 70 minutes of his interrogation transcript. It is this testimony to which the prosecutor directed the jury during argument: "I asked . . . , 'You've seen the transcript [of the police interview]. You spent over 70 pages trying to convince them.' And he said yes. . . . [¶] . . . [¶] . . . He put forth all that effort to convince them. They didn't believe him. So he goes to plan B. Self-defense, right? That's plan B. Let's see if that will work. I did it, but I thought I was going to die. They still didn't believe him. Now he wants you to believe him." As such, the prosecutor's argument was fair. (See *People v. Dennis, supra*, 17 Cal.4th at p. 522 ["Harsh and vivid attacks on the credibility of opposing witnesses are permitted, and counsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie"].)

C.     *Vouching for a Witness's Credibility.*

Defendant contends the prosecutor engaged in misconduct by repeatedly vouching for C.B. We again disagree.

"A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring

26

to evidence outside the record.  [Citations.]  Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial. [Citation.]  However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching."  (*People v. Frye* (1998) 18 Cal.4th 894, 971.)

Defendant complains that the prosecutor repeatedly argued that C.B. had been " 'consistent' " in telling what he knew from the time he first talked to the police, had not been impeached, and was an " 'honest' " and " 'unsalable [*sic*]' " witness.  Yet, defendant makes no showing that, when making assurances regarding C.B.'s integrity, the prosecutor was referring to evidence outside the record or offering the impression that he had taken independent steps to confirm his honesty.  To the contrary, C.B. was cross-examined, which gave defense counsel ample opportunity to question his honesty and attempt to impeach his testimony.  The prosecutor was entitled to argue that defense counsel was unable to do so. (*People v. Frye, supra*, 18 Cal.4th at p. 971.)

D.    *Offering Personal Beliefs and Vouching for the Prosecutor's Own Professional Integrity.*

Defendant contends the prosecutor inappropriately offered his own opinions about defendant's statement to the police that he feared no one " 'but God' " (which the prosecutor found " 'shocking' ") and about whether surveillance camera footage showed that the person who ran out of 7533 Arthur took a gun from Hernandez's body (or, as the prosecutor believed, just hopped over his body).  Defendant also contends the prosecutor improperly

27

vouched for his own integrity by telling the jury, " 'I'm not a big objector, particularly in closing argument. I know what the law allows, and I know what the law requires.' "

Again, we find no misconduct. "[A] prosecutor is permitted to offer an opinion on the state of the evidence" but "may not give a personal opinion or belief as to the defendant's guilt if it will suggest to the jury the prosecutor has information bearing on guilt that has not been disclosed at trial." (*People v. Frye, supra*, 18 Cal.4th at pp. 975, 976.) Here, the prosecutor did no more than opine on the state of the evidence when suggesting that defendant's statement that he feared only God undermined his claim to have shot Hernandez out of fear and that the surveillance footage did not support his claim that someone took a gun from Hernandez's body before the police arrived.

Defendant also complains about the prosecutor's assertions that he was not a " 'big objector' " and " 'know[s] what the law requires.' " "Ultimately, the test for misconduct is whether the prosecutor has employed deceptive or reprehensible methods to persuade either the court or the jury." (*People v. Dennis, supra*, 17 Cal.4th at p. 522.) The prosecutor's assertions were neither deceptive nor reprehensible. And even if so, the question would be "whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra*, 25 Cal.4th at p. 44.) In this instance, the answer to this question is no.

E. *Denigrating Defendant's Case and Counsel.*

Defendant contends the prosecutor wrongfully (1) insinuated that his self-defense claim was fabricated or "contrived after the fact" and (2) denigrated defense counsel by suggesting to the jury that she had played a segment of the surveillance footage four times " 'because she [did not] like

28

[defendant's] answer' "[15] as to whether it showed a person taking a gun from the body. (Second bracketed insertion added.)

As before, there is no misconduct. As explained, a prosecutor has wide latitude to draw inferences from the evidence. (*People v. Hill, supra*, 17 Cal.4th at p. 823.) The record here reflects that defendant fled the scene of the killing, discarded his gun, and initially lied to the police when brought in for questioning months later—all of which invited the prosecutor's inference that defendant crafted his self-defense claim after being arrested.

The same is true for the prosecutor's remark about defense counsel's replaying the surveillance footage four times. Given the wide latitude afforded attorneys at trial, the prosecutor could properly infer from defense counsel's conduct that she was pressing defendant on this issue in an attempt to secure favorable testimony for his self-defense claim, and could properly share this inference with the jury. (See *People v. Centeno* (2014) 60 Cal.4th 659, 667 [court will " ' "not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements' "].) This is proper argument and not an unfair attack on defense counsel's integrity.

F. *Appeal to Community Values or the Jury's Passions and Prejudices*

Finally, defendant contends the prosecutor improperly appealed to community values and to the jury's passions and prejudices during closing argument. First, the prosecutor argued, "This is about retaliation. . . . This is about being a vigilante. We don't . . . allow vigilantes to go and take justice into their own hands. We don't allow it." Second, the prosecutor relied on

---

[15] After repeated viewings, defendant was unable to identify which of the three men reached down to retrieve something from Hernandez's body.

several hypotheticals when analogizing defendant to an armed victim of a robbery, a cowboy, and an active shooter in the courtroom.

As to the first example, putting aside defense counsel's failure to object to the prosecutor's statement, we conclude it was a fair and accurate description of the prosecution's theory that defendant fired eight shots at Hernandez in an unsuccessful attempt to take the law into his own hands after someone (Hernandez) fired a bullet toward E.C.'s car. The prosecutor appropriately argued that such vigilante conduct is against the law. We find no misconduct.

The second example relates to several hypotheticals the prosecution presented to the jury to analogize defendant's conduct to various actors. The law provides that "it is not misconduct for a prosecutor to invoke examples to illustrate a general point about the operation of the law." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 291.) Here, the prosecutor relied on these hypotheticals to illustrate situations in which an initial aggressor would not be entitled to self-defense. For example, the prosecutor argued that if a person walking with a gun gets robbed, this person reaches for his or her gun and the robber then shoots him or her, the robber cannot claim self-defense. Similarly, if a person enters a courtroom with a gun and the courtroom deputy responds by reaching for his or her gun, the armed person cannot shoot the deputy and claim self-defense. In the context of this case, where the evidence showed that defendant left his house and entered the street with a loaded gun in hand, aggressively confronted Hernandez about firing a bullet at E.C.'s car, and ended up shooting him seven times, the prosecutor's arguments were appropriate. (See *People v. McDermott* (2002) 28 Cal.4th 946, 1003 [remarks "comparing defendant to a germ, a mad dog, and a snake . . . were a permissible form of argument designed to show the circumstances in which

30

society may be justified in taking one life to protect the lives of others"]; *People v. Mendoza* (2016) 62 Cal.4th 856, 906–907 [no misconduct where the prosecutor argued, " '[I]f you can envision a case where somebody gets in an argument with another person and tempers flare, somebody pulls a gun, shots are fired, one, two, maybe three shots, and when the smoke clears, somebody is dead, and there's a question and there's responses: Well I thought he had a gun. Well, I was just trying to scare him. Well, I didn't know it was loaded. [¶] Those are cases where there's a question as to whether or not there was an intent to kill, a question of malice aforethought' "].)

Accordingly, for the reasons stated, we have rejected each of defendant's prosecutorial misconduct claims for lack of misconduct or lack of prejudice. We therefore need not address defendant's alternative argument that his counsel's failure to object to all of the challenged statements was ineffective assistance. (See *People v. O'Malley* (2016) 62 Cal.4th 944, 1010, fn. 12 ["Because we find either no misconduct, or, assuming misconduct, no prejudice, counsel's failure to object was not ineffective assistance"]; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1333–1334 ["defense counsel had no basis for objecting to the statement, and was not deficient for declining to do so"].) We proceed to the next issue.

## IV. *Exclusion of Testimony Regarding the Victim's State of Mind Just Before the Shooting.*

Defendant contends the court abused its discretion when excluding evidence "absolutely critical" to his defense that, according to the preliminary hearing testimony of Hernandez's friend V.M., Hernandez was scared for his life and paranoid just before defendant shot him.

Specifically, the court excluded the portion of V.M.'s testimony in which he stated that just before being shot, Hernandez was "panic[ked]," "nervous,"

31

and "fidgety" because he believed "a group of people that lived in a different neighborhood"—and in particular a gang member who was a "border brother"—was going to kill him. Also excluded was V.M.'s testimony that (1) Hernandez told V.M. that something was going to happen to him; (2) when V.M. and Hernandez went to a liquor store together on the night of the shooting, an African-American man looked "meanly" at Hernandez, which made Hernandez angry, but "not exactly scared"; and (3) V.M. did not see Hernandez with a gun at the liquor store, or point a gun at anyone there, and did not tell defendant otherwise.

The court excluded this testimony as "very speculative" and "not relevant." This ruling was proper.

While, generally speaking, all relevant evidence is admissible, under Evidence Code section 352 the trial court has broad discretion to determine that relevant evidence should nonetheless be excluded because its probative value is substantially outweighed by its prejudicial effect. (*People v. Champion* (1995) 9 Cal.4th 879, 922; Evid. Code, § 352.)

On appeal, a trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) "The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice." (*People v. Avitia, supra*, 127 Cal.App.4th at p. 193; *People v. Dyer* (1988) 45 Cal.3d 26, 73.)

Here, we find nothing arbitrary, capricious, or patently absurd about the trial court's exclusion under Evidence Code section 352 of some, but not all, of V.M.'s preliminary hearing testimony relating to Hernandez's state of mind just before his death. (*People v. Avitia, supra*, 127 Cal.App.4th at p.

32

193.)  V.M.'s testimony that Hernandez feared other "people that lived in a different neighborhood" and, in particular, a gang member who was a "border brother," is far removed from any feeling Hernandez may have had about defendant, his neighbor, or defendant's girlfriend, E.C.  In fact, defendant testified that Hernandez told him he fired a bullet at E.C.'s car because E.C. was making their neighborhood "hot," not because he feared her or defendant.  Nor is there evidence that the defendant was aware of Hernandez's fear of or paranoia about other, unknown people.  The trial court thus reasonably found that the evidence of Hernandez's state of mind was not relevant to defendant's self-defense claim, which, as discussed, hinges on his own state of mind, not his victim's.

We also reject defendant's argument that exclusion of this evidence implicated his constitutional right to present a complete defense.  " 'Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in his favor [citations], " . . . the proffered evidence must have more than 'slight-relevancy' to the issues presented." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 865.)  Thus, while defendant may be correct that his subjective belief in the need for self-defense was the heart of his case, "this does not mean the trial court constitutionally was compelled to permit [him] to introduce all possibly relevant evidence on these subjects despite its marginal relevance, the possible effect upon the jury's ability to remain focused on the issues before it (rather than becoming sidetracked on collateral questions), and the potentially significant amount of time entailed in admitting the evidence in a manner fair to both sides.  (See *People v. Cornwell* (2005) 37 Cal.4th 50, 82 [33 Cal.Rptr.3d 1, 117 P.3d 622] ['a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—

33

generally does not infringe upon' the constitutional right to offer a defense]; [citations].)" (*People v. Fuiava, supra*, 53 Cal.4th at pp. 665–666.) As mentioned, the trial court excluded only a small portion of V.M.'s preliminary hearing testimony. The court admitted testimony from V.M. that was quite helpful to defendant's self-defense claim, including that Hernandez was armed and smoked methamphetamine, or crystal, on the night in question; that V.M. saw Hernandez remove and display his gun after smoking the drugs; and that on the morning after the shooting, defendant tearfully admitted shooting Hernandez because he feared Hernandez had a gun and was going to shoot him. The court did not abuse its discretion in refusing to admit all of V.M.'s testimony notwithstanding the degree of its relevance.

Finally, even assuming for the sake of argument that this evidence should have been admitted, given its minimal relevance, it is not reasonably likely that admitting it would have led to a different verdict. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 611–612 [exclusion of evidence, even if erroneous, is harmless if it does not appear reasonably probable verdict was affected].)

On this record, the trial court's evidentiary ruling stands.

V. ***Failure to Instruct the Jury Not to Draw an Adverse Inference from the Police's Failure to Recover Evidence.***

Defendant contends the trial court prejudicially erred by refusing to instruct the jury not to draw an inference adverse to the defense from the police's failure to recover footage from M.M.'s security camera. Defendant reasons that this footage would have proved E.C.'s car was parked in front of M.M.'s house just before the single shot was fired, thereby corroborating his testimony that Hernandez shot at E.C.'s car as she drove away. By not giving the instruction, he claims, the court opened the door to the prosecutor's argument that no evidence supported his testimony that Hernandez shot at E.C. The following record is relevant.

34

At trial, citing *Arizona v. Youngblood* (1998) 488 U.S. 51, 57,[16] defense counsel requested that the court instruct the jury that "there were items not seized by the police and therefore that shouldn't be held against [defendant] . . . ."[17]  Defense counsel did not propose actual language for a pinpoint instruction.  The trial court denied defense counsel's request because there was no affirmative showing as to what the lost footage contained.  However, the court confirmed defense counsel would be permitted to cross-examine M.M. as to what she saw when she viewed this footage.  Defense counsel replied to the court, "I'll take it on that task," and thereafter cross-examined M.M. without reasserting her request for a pinpoint instruction.  On this record, the court's ruling stands.

As an initial matter, we question the premise underlying defendant's proposed instruction, to wit, that the police improperly "fail[ed] to preserve the evidence" and the jury should not draw an inference adverse to defendant based on its failure.  While M.M. assumed in testimony that the police had seen the footage from her surveillance camera, there is no evidence in the record that the police took possession of it, much less viewed and discarded it.  "[D]ue process does not require the police to *collect* particular items of evidence." (*People v. Frye, supra*, 18 Cal.4th at p. 943, italics added.)  The trial court was under no duty to give a pinpoint instruction that had no factual basis in the record.  (*People v. Bolden* (2002) 29 Cal.4th 515, 558–559.)

In any event, the court's denial of defense counsel's instruction request did not preclude defendant from providing corroborating evidence for his

---

[16] *Arizona v. Youngblood, supra*, involved the police's failure to preserve evidence potentially useful to the defendant.  (488 U.S. at pp. 57–58.)

[17] Defense counsel also asked for dismissal based on the police's failure to recover this evidence.

testimony that Hernandez shot at E.C.'s car as it was parked outside his house. As stated, after denying counsel's request, the court permitted M.M. to be questioned on the contents of the uncollected footage. M.M. testified that on the day after the shooting, she viewed this footage, which was captured by a camera pointed directly across the street at defendant's house. On cross-examination, M.M. confirmed seeing on this footage E.C.'s car parked outside defendant's house. M.M. then testified: "He [defendant] got out with bags. He was dropped off. The car was leaving. Somebody from 7533 [Arthur] got out, shot as the car was leaving. The car left. The guy went back into 7533—he [defendant] was already inside his house. He came back out with the bags, looked around, because he didn't know what took place, I guess." Later, under questioning from the prosecutor, M.M. clarified that she could not actually see the man shoot at the car; however, based on when she recalled hearing gunshots, she assumed this man had done so. To the extent this clarification undermined defendant's testimony, it was not the fault of the court's ruling.

Moreover, at no point after M.M.'s testimony did defense counsel revisit the issue of a pinpoint instruction, or propose appropriate language for it, as the law required. (See *People v. Andrews* (1989) 49 Cal.3d 200, 218.) Under these circumstances, the trial court's refusal to give the pinpoint instruction was both proper and harmless to defendant.

## VI.    *Cumulative Error.*

Finally, defendant contends the cumulative effect of the claimed errors was to deprive him of his right to due process under the federal Constitution. Under the cumulative error doctrine, we reverse the judgment if there is a "reasonable probability" that the jury would have reached a result more favorable to defendant absent a combination of errors. (E.g., *People v.*

36

*Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)  However, as discussed *ante*, there were few if any errors made at trial, and no prejudicial error.  Thus, even assuming for the sake of argument that defendant's trial was imperfect, there is no basis for reversing the judgment.  (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 ["The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial' "].)

## DISPOSITION

The judgment is affirmed.

_____
Jackson, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A156388/*People v. Veelewerance Harrison*